Elizabeth J. Goldstein, Esq.
Maryland Atty. Id. No. 1101050004
egoldstein@dilworthlaw.com
Dilworth Paxson LLP
Penn National Insurance Building
2 North 2nd Street, Suite 1101
Harrisburg, Pennsylvania 17101
T:  (717) 213-4106
F:  (717) 236-7811
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
### DISTRICT OF MARYLAND
### NORTHERN DIVISION

| | |
|---|---|
| WILLIAM DOUGLAS CAMPBELL, and<br>c/o Crystal River Post Office<br>18 N.E. 4th Avenue<br>Crystal River, Florida 34429 | Case No. |
| SIGMA TRANSNATIONAL INC.,<br>4428 S.W. 35th Terrace<br>Gainesville, Florida 32608 | **JURY TRIAL DEMANDED** |
| Plaintiffs, | |
| v. | |
| VADIM MIKERIN,<br>Register # 58344-037<br>Rivers Correctional Institute<br>P.O. Box 630<br>145 Parker's Fishery Road<br>Winton, North Carolina 27986 | **COMPLAINT** |
| TRANSPORT LOGISTICS INTERNATIONAL, INC.,<br>t/a DAHER-TLI,<br>c/o J. Michael Rosso<br>8161 Maple Lawn Boulevard, Suite 450<br>Howard County<br>Fulton, Maryland 20759 | |

DAREN CONDREY, and                                        :
3218 Huntersworth Way                                     :
Howard County                                             :
Glenwood, Maryland 21738                                  :
                                                          :
JOHN DOES 1 THROUGH 15,                                   :
                                                          :
                              Defendants.                 :

## COMPLAINT

Plaintiffs WILLIAM DOUGLAS CAMPBELL and SIGMA TRANSNATIONAL INC., by and through their counsel Dilworth Paxson LLP, hereby file this Complaint against Defendants VADIM MIKERIN, TRANSPORT LOGISTICS INTERNATIONAL, INC., t/a DAHER-TLI, DAREN CONDREY, and JOHN DOES 1 THROUGH 15 to recover for violations of the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.*, and common law claims of civil conspiracy, conversion, and negligent misrepresentation, and in support thereof allege as follows:

## INTRODUCTION

1.      The Russian Federation executed an Agreement with the United States of America in 1992 to dispose of Russia's Highly Enriched Uranium, collected from decommissioned nuclear weapons, by blending it down and selling it as Low Enriched Uranium ("**LEU**") to U.S. utility companies. Techsnabexport ("**Tenex**") was the Russian agent responsible for the sale and transportation of LEU.

2.      In approximately October 2010, Tenex created Tenam Corporation ("**Tenam**") to head its U.S.-based operations, which supported Tenex's sale and transportation of nuclear fuel to and within the U.S.   Tenex installed Defendant Vadim Mikerin ("**Mikerin**"), a Tenex official, as Tenam's new Executive Director.   Thereafter, Mikerin was employed by Tenam and operated and managed the affairs of Tenam.

3.      But, Mikerin was engaged in a kickback and extortion scheme, possibly as early as 2006, with Defendant Transport Logistics International, Inc., t/a Daher-TLI, ("**TLI**"), a nuclear materials transportation company that held a contract with Tenex and the United States Enrichment Corporation to transport LEU to U.S. utilities' facilities; Rodney (Rod) Fisk ("**Fisk**"), TLI's President until December 2009 (and who died in August 2011); and Defendant Daren Condrey ("**Condrey**"), TLI's Co-President from 2010 until October 2014.

4.      Mikerin, utilizing the authority of his employment, recruited vendors, such as TLI, to whom he would guarantee an exclusive contract with Tenex in exchange for a kickback paid from the proceeds of the contract with Tenex.

5.      In an effort to increase the amount of money the Defendants could receive as part of the existing kickback and extortion scheme, TLI, through Fisk, recruited the Plaintiffs to provide consulting services to Tenex.  The Defendants conspired to operate legitimate businesses in illegitimate ways.

6.      After convincing Tenex officials to hire Plaintiff Sigma Transnational Inc. ("**Sigma**"), of which Plaintiff William Douglas Campbell ("**Campbell**") was president and owner, to, *inter alia*, coordinate and assist with the needed approvals of Tenex's contracts for sale of Russian LEU to U.S. utilities, the Defendants started demanding cash and wire transfers of sums of money from the Plaintiffs and threatening Campbell with physical harm and the Plaintiffs with economic injury to their business if they did not cooperate with these demands.

7.       The Defendants' extortion of the Plaintiffs continued until at least June 7, 2012, when the Plaintiffs were terminated from their contract with Tenex.  Despite providing almost $1.2 million worth of legitimate consulting services, the Plaintiffs were forced to divest themselves of at least

$460,000, but likely as much as $760,000, of their compensation to the Defendants due to the kickback and extortion scheme.

8.      Thanks in part to Campbell providing of information to the U.S. Federal Bureau of Investigation ("**FBI**") as soon as he became aware of the kickback and extortion scheme, the U.S. Attorney's Office for the District of Maryland arrested both Mikerin and Condrey for activities associated with the allegations in this Complaint.

**PARTIES**

9.      Plaintiff William Douglas Campbell, an adult individual, is a resident of Florida, has a permanent address c/o Crystal River Post Office, 18 N.E. 4th Avenue, Crystal River, Florida 34429,[1] and is formerly a consultant in the nuclear fuel sales industry.

10.     Plaintiff Sigma Transnational Inc. was a Florida corporation with a principal place of business at 4428 S.W. 35th Terrace, Gainesville, Florida 32608 until it was administratively dissolved on September 24, 2010.

11.      Collectively, Campbell and Sigma are referred to as "**the Plaintiffs**."

12.     Defendant Vadim Mikerin, an adult individual, is a North Carolina resident and is located at Rivers Correctional Institute,  Register # 58344-037, 145 Parker's Fisher Road, Winton, North Carolina 27986 and previously resided, upon information and belief, at 5600 Wisconsin Avenue, Apartment 302, Chevy Chase, Maryland in Montgomery County.

13.     The United States Attorney's Office for the District of Maryland filed a Criminal Complaint against Mikerin on or about July 25, 2014 for violations of the Hobbs Act, 18 U.S.C.A. § 1951, for conspiring to affect commerce through threats of violence and economic loss.   Upon

---

[1]      Campbell cannot publicize his home address due to serious concerns for his safety because he cooperated with the federal criminal investigation that relates to the facts and circumstances underlying in this Complaint.

information and belief, Mikerin pled to, *inter alia*, charges of conspiracy to commit money laundering, 18 U.S.C.A. § 371, and was sentenced on December 15, 2015 and imprisoned.

14.     Defendant Transport Logistics International, Inc., t/a Daher-TLI, is a Maryland corporation with its principal place of business at 8161 Maple Lawn Boulevard, Suite 450, Fulton, Maryland 20759 in Howard County and a registered agent J. Michael Rosso acting at the same address.

15.     Defendant Daren Condrey, an adult individual, is a resident of Maryland and resides at 3218 Huntersworth Way, Glenwood, Maryland 21738 in Howard County.

16.     The United States Attorney's Office for the District of Maryland charged Condrey with a Criminal Complaint on October 29, 2014 for violating 18 U.S.C.A. § 1349 by conspiring to commit wire fraud and arrested him.  Upon information and belief, Condrey pled guilty on or about June 17, 2015 to a Criminal Information charging conspiracy to violate the Foreign Corrupt Practices Act and to commit wire fraud but, upon information and belief, has not yet been sentenced.

17.     Collectively, TLI and Condrey are referred to herein as "**the TLI Defendants**."

18.     John Does 1 through 15 are yet-to-be-ascertained defendants that may have engaged in similar or identical conduct as described herein.

19.     Together, Mikerin, the TLI Defendants, and John Does 1 through 15 are collectively referred to as "**Defendants**."

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over this matter pursuant to 28 U.S.C.A. § 1331 because Plaintiffs' claims arise under the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.*, ("**RICO**").

21.     This Court also has jurisdiction over this matter pursuant to 28 U.S.C.A. § 1332 since there is diversity of citizenship between the Plaintiffs, citizens of Florida, and Defendants, citizens of North Carolina and Maryland, and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

22.     This Court has supplemental jurisdiction over the state common law claims pursuant to 28 U.S.C.A. § 1367 as they are related to claims in the Complaint over which this Court has original jurisdiction and form part of the same case or controversy.

23.     This Court has personal jurisdiction over all of the Defendants because one or more of the Defendants is found, has an agent, or transacts business in this District, but there is no District in which all Defendants are found, transact business, have agents, or reside.

24.     Venue in this Court is proper under 28 U.S.C.A. § 1391 and 18 U.S.C.A. § 1965(b) because a substantial part of the events or omissions giving rise to the claim occurred within this District and the ends of justice require that parties residing in any other District be brought before this Court.

## FACTUAL BACKGROUND

25.     Mikerin was employed by Tenex as its Director of the Pan American Department until October 2010.  In this role, Mikerin operated and managed the affairs of Tenex.

26.     In October 2010, Mikerin moved from Tenex and joined Tenam as its Executive Director.  In this role, Mikerin operated and managed the affairs of Tenam.

27.     Together, Tenex, until Mikerin left its employ in October 2010, and Tenam, from the start of Mikerin's employment in October 2010 and onward, are "**the Enterprise**."  Tenex, until October 2010, and Tenam, from October 2010 and onward, constitute an Enterprise within the meaning of 18 U.S.C.A. § 1961(4).

6

28.     The Defendants were all officers, agents, representatives, or contractors of the Enterprise and would coordinate Tenex's activities in the U.S. and assist Tenex in entering into legitimate contracts with U.S. utility companies to sell and transport Russian LEU fuel products via interstate and international commerce.   Thus, the Enterprise was engaged in interstate and international trade and commerce.

29.     However, through extortion, the Defendants diverted or caused to be diverted large sums of money away from Tenex to themselves.

30.     The Plaintiffs were unwilling victims of extortion in this kickback and extortion scheme. Campbell reported the scheme to the FBI almost immediately upon his introduction to it, which resulted in the eventual federal arrests of Mikerin and Condrey.   Nevertheless, in the intervening years of the FBI's investigation, Campbell has suffered threats of violence, physical and mental stress, and the Plaintiffs have lost at least $460,000, but likely as much as $760,000, in illegally diverted income.

### Campbell's Introduction to the Defendants

31.     Upon information and belief, Mikerin and the TLI Defendants were engaged in an ongoing kickback and extortion scheme as early as 2006 – prior to when the Plaintiffs were first hired by Tenex – in which Mikerin agreed to provide TLI with non-competitive contracts on behalf of Tenex for the transportation of nuclear fuel into and within the U.S. in exchange for kickbacks from the TLI Defendants.

32.     The Defendants grew greedy and sought to expand the kickback and extortion scheme to benefit all of the Defendants.   Upon information and belief, the Defendants sought to achieve this goal by conspiring to increase the value of Tenex's contracts in the U.S. – and, by extension, Tenam's value to Tenex – and by hiring more companies and entities as vendors to be the victims of extortion.

33.     Sometime in approximately 2005, Campbell was introduced to Fisk, then president of TLI.

34.     Prior to his work with the Defendants, Campbell was a consultant for the U.S. Department of Agriculture credit programs and promoted domestic farm products abroad.

35.     Fisk thereafter introduced Campbell to Mikerin on or about November 7, 2005.  Fisk convinced Mikerin to hire Campbell as a consultant for Tenex despite the fact that Campbell previously had no experience with nuclear fuel sales.

36.     In 2007 and 2008, Campbell arranged for a consulting contract between Tenex, operating at Mikerin's direction, and Cassidy and Associates, a government relations firm.  For his role in arranging the contract, Campbell received a monthly payment from Cassidy and Associates, which provided legitimate lobbying services for Tenex.  Campbell also worked as a consultant to Cassidy on this project.  Campbell's duties included, but were not limited to, coordinating meetings between Cassidy and Tenex, compiling information about the nuclear industry, particularly in the U.S., and preparing Tenex to start selling LEU to U.S. utility companies by making introductions to the necessary public and private sector officials.

37.     During this time, Mikerin told Campbell that the Plaintiffs could have the same contract with Tenex, but hold it directly, if Campbell learned the processes and systems associated with nuclear fuel sales.

38.     Campbell was interested in this offer in part due to the potential for greater earnings.  In order to express his interest and capabilities, Campbell started preparing presentations regarding nuclear processes and the business of nuclear fuel sales to visiting Tenex officials.  These presentations were devised with the assistance of Mikerin and Fisk.

39.     Tenex, upon the Defendants' urging, thereafter formally hired Campbell's consulting company, Sigma, on July 1, 2009, and the two parties entered into a Contract for Lobbying and Consulting Services ("**Contract 1**").   Contract 1 is attached hereto as **Exhibit A**.   Per the terms of Contract 1, Sigma, and by extension Campbell, was to, *inter alia*, "coordinate on and monitor the approval process by the U.S. Department of Commerce of the 5 (five) commercial contracts executed by Tenex with the U.S. utilities for the Russian uranium products supplies to the U.S. market …," "[c]ommunicate with/within relevant groups … to improve the media and political environment in the U.S. in respect of supplies of the Russian uranium products[,]" and "[s]et up meetings with U.S. Administration officials, Members of Congress and other key opinion elite with Tenex and Russian Government officials[.]"   Exhibit A, p. 1.   The Plaintiffs were to receive $50,000 a month in compensation for this work. *Id.*

40.     The Plaintiffs operated under the Contract for approximately three months before being offered an addendum dated September 28, 2009 ("**Contract 2**"), which extended the term of Contract 1 through December 31, 2010.   The Addendum is attached hereto as **Exhibit B**.   The services Sigma was to provide included, *inter alia*, coordinating and monitoring U.S. approval of utility companies' contracts with Tenex and working to improve the political environment for Russian nuclear fuel products.   Exhibit B, pp. 2-3.   The compensation for the Plaintiffs' services remained at $50,000 per month. *Id.* at p. 3.

41.     In approximately 2010, Campbell transferred Sigma's operations to "William Campbell d/b/a Sigma Transnational Inc." and was informed by Defendant Vadim Mikerin not to update the name in Sigma's contract with Tenex.   The parties, including the Defendants, operated as though Campbell held Sigma's contract with Tenex.

42.     The Plaintiffs received Letters of Authorisation [*sic*] for 2009, 2010, and 2011 to conduct work within the scope of their contracts on behalf of Tenex.

43.     The Plaintiffs' contracts were extended through mid-2012.  During the entire period of his employment, Sigma and Campbell were required to perform similar consulting and lobbying services for Tenex, which paid them $50,000 per month.  As part of their provision of legitimate consulting services, the Plaintiffs contributed toward Tenam arranging almost $6 billion in contracts for Tenex with U.S. utilities.

44.     On June 7, 2012, Tenex terminated the Plaintiffs' consulting contract.

### The Extortion Scheme

45.     As Campbell would later learn, the multi-year lead-up to the offering of Contract 1 and the three month gap between Mikerin's offering of Contract 1 and Contract 2 were used by the Defendants to determine whether Campbell would cooperate with their pre-existing kickback and extortion scheme.

46.     In the early days of his contract with Tenex, Campbell was told that he would need assistance in Europe as part of his work involved transporting and selling Russian nuclear fuel products internationally.  He was told to hire Wiser Trading Limited ("**Wiser**"), incorporated in the Republic of Seychelles, as his consultant and instructed by Mikerin and Fisk to wire Wiser money.

47.     Campbell became immediately suspicious of these transfers because he knew of no contract with Wiser, Wiser had not provided him with any consulting reports, and he could not find any information about the company on the Internet.  However, when he confronted Mikerin about these discrepancies, Mikerin told Campbell that his hiring and wiring money to Wiser was key to maintaining his contract with Tenex.

48.     This demand marked the start of a series of "requests" by the Defendants for wire transfers or cash payments to Wiser, Leila Global Limited ("**Leila**"), a company incorporated in the United Kingdom, International Fuel Services LLC" ("**IFC**"), Fisk's consulting company that operated after his departure from TLI until his death in August 2011, and other entities controlled by the Defendants or their co-conspirators, known and unknown.

49.     In addition, Mikerin asked Campbell on several occasions to provide cash in envelopes to visiting Tenex officials.  When payments were made in cash, Campbell packaged the money in yellow envelopes, per Mikerin's instructions, in amounts of $5,000 to $10,000 per envelope.  These payments were distributed, *inter alia*, to the Defendants, including Mikerin, Fisk, and visiting Tenex officials such as Ludmila Zalimskaya, Sergey Polgorodnik, and Alexey Grigoriev.

50.     Mikerin and other Tenex officials, such as Polgorodnik, threatened Campbell that if he did not cooperate, he would suffer physical and economic harm.

51.     Frequently, Tenex officials, including Mikerin and Marina Buzina, would provide edits or re-writes of Campbell's presentations and reports.  Upon information and belief, these revisions were offered as "consulting services" to the Plaintiffs so as to make the Plaintiffs' extorted wire and cash transfers appear to be legitimate if questioned.

52.     Under Contract 1, Mikerin demanded at least one third of the total value of the contract as a kickback on behalf of the Defendants and others, known and unknown, including other Tenex officials.

53.     Under Contract 2, Mikerin demanded half of the total value of the contract, paid on a bi-monthly basis in payments of $50,000, on behalf of the Defendants and others, known and unknown, including other Tenex officials.

54.     Even after the conclusion of Contract 2, Mikerin demanded continued kickbacks on behalf of the Defendants and others, known and unknown, including other Tenex officials.

55.     As the kickback and extortion scheme progressed, in approximately 2010, Mikerin told the Plaintiffs to hire the TLI Defendants as purported consultants.   The Plaintiffs were forced to make separate bi-monthly payments to TLI for minimal or alleged consulting services or to cover the costs of TLI's own consultants.   Such payments would be due in the months the Plaintiffs were not wiring $50,000 to Mikerin.

56.     Fisk made demands for payment from the Plaintiffs when he was President of TLI as well as once he started his own consulting firm, IFC.   Upon Fisk's retirement from TLI, Condrey continued TLI's role in the Defendants' fraudulent and criminal scheme without interruption.   In fact, due to Condrey's long-standing employment with TLI, Campbell knew as early as July 6, 2009 that Condrey could step in for Fisk whenever he was not available.

57.     TLI, particularly Fisk, would, on occasion, provide suggestions and edits to presentations Campbell had drafted.   Upon information and belief, these revisions were offered as "consulting services" to the Plaintiffs so as to make the Plaintiffs' extorted wire and cash transfers appear to be legitimate if questioned.

58.     TLI, particularly Fisk, would also demand the Plaintiffs to pay the invoices of consultants hired by TLI.

### Campbell Initiates and Assists the FBI's Investigation of the Defendants

59.     Campbell voluntarily reported the initial request for a kickback to the FBI.   The FBI and the U.S. Department of Justice authorized the Plaintiffs to participate in the kickback and extortion

scheme so that they could start documenting Mikerin's activities in the U.S., as well as others involved in illegal activity.

60.    Thereafter, Campbell served as an informant for the FBI and kept the FBI abreast of the Defendants' kickback and extortion demands and his interactions with the Defendants.

61.    He would also wear wires to meetings with the Defendants and be video recorded. Moreover, he would schedule meetings with the Defendants, even after his contract with Tenex ended, to gather more information.  For example, he scheduled an in-person meeting with Condrey and his Co-President Mark Lambert on August 14 and 15, 2014 at the FBI's request.

62.    In fact, upon information and belief, the Defendants had Tenex end its contractual relationship with Campbell on June 7, 2012 after they became nervous due to a series of questions Campbell asked Mikerin and Polgorodnik at the behest of the FBI.

63.    Due to the long-running nature of the FBI's investigation, the Plaintiffs were specifically told by various FBI agents and Assistant U.S. Attorneys to avoid filing any lawsuit against the Defendants as doing so would jeopardize the FBI's confidential investigation.  The Plaintiffs were also prevented from ending their contracts with Tenex as that would foreclose the FBI's ability to continue its investigation, which has, to date and thus far, resulted in criminal pleas from both Mikerin and Condrey.

### The Defendants Threaten Campbell to Continue his Participation in the Extortion Scheme

64.    Campbell was repeatedly threatened by Mikerin and other Tenex officials and agents that he would suffer harm if he did not cooperate with the extortion scheme.

65.    When he was first hired, Campbell was accosted privately by Tenex official Polgorodnik in Washington, D.C.   Specifically, Polgorodnik asked Campbell, "Can we trust you?"   Campbell

understood Polgorodnik was referring to Campbell remitting monies pursuant to the kickback and extortion scheme.

66.     The Defendants, particularly Mikerin, as well as Polgorodnik repeatedly reminded Campbell between 2009 and 2012 that they were part of a network operating in the U.S., Europe, and the Middle East that included several dangerous people who could harm him.  Campbell was repeatedly threatened with physical harm and the Plaintiffs were repeatedly threatened with economic injury from the potential loss of their contract with Tenex were they to deny a kickback and extortion request.

67.     On one such occasion, Mikerin warned Campbell that he may suffer harm if Mikerin were to report to his network that there was a problem with the kickbacks.  Upon information and belief, the FBI has a recording of at least this one conversation.

68.     Campbell became an unwilling participant in the Defendants' growing extortion scheme, although at all times, he kept the FBI informed, acted with their consent, and participated in their investigation.

69.     In sum, Campbell's contracts with Tenex were worth $1,199,975.  However, he was forced to divest at least $460,000, but likely as much as $760,000, of it to the Defendants due to the kickback and extortion scheme.

***The Use of Mail and Interstate Wires in Furtherance of the Fraudulent Scheme***

70.     The Defendants made repeated and continuous use of interstate wires and the United States mail in furtherance of their fraudulent scheme.

71.     The Plaintiffs received drafts of their contracts with Tenex via electronic mail ("**e-mail**") and, once approved, they received hard copies via mail to sign.  The Plaintiffs then returned the signed contracts via Federal Express.

72.    Similarly, as part of their legitimate consulting services, the Plaintiffs would submit monthly work reports and invoices to Tenex by way of Federal Express.  On occasion, these work reports and invoices would be returned to them with corrections and additions written by Mikerin, Buzina, or Fisk so as to justify Tenex's payments of $50,000 per month.

73.    In addition, the Plaintiffs routinely received e-mailed wiring instructions to transfer extorted funds that were part of the Defendants' kickback and extortion scheme to specific wire coordinates.  These instructions were given by Mikerin, Fisk, and most frequently, by an anonymous individual named "F" for friend, writing from schlyapa2009@yandex.ru, which the FBI has since determined was also Mikerin.  For example:

a.    On September 20, 2009, Mikerin, using the alias "F," e-mailed Campbell that he was to "transfer due funds in USD using the instructions enclosed," which provided wire transaction information for Wiser.  Mikerin instructed Campbell to note a particular phrase, "Service Contract 2009/09" on the transfer and that he had only between September 21 through 23, 2009 to complete the wire.  This e-mail is attached as **Exhibit C**.

b.    Similarly, on August 19, 2010, Mikerin, using the alias "F," e-mailed Campbell to wire funds to Wiser via a new bank.  Campbell was informed that he should "proceed accurately" and that the "window is opened till [*sic*] Aug. 25."  This e-mail is attached as **Exhibit D**.

c.    Mikerin, using the alias "F," e-mailed Campbell again, on February 11, 2011, to ask him to "confirm your action without any delay," meaning the timing of Campbell's kickback payment, as Mikerin needed Campbell's "reply asap to open 'Window'."  This e-mail is attached as **Exhibit E**.

15

d.      Upon information and belief, these so-called "windows" of opportunity for Campbell to forward funds via a wire transfer were related to when the Defendants could have a friendly bank employee in place in the foreign county who would receive the funds without alerting any authorities to the transfer.

74.     The U.S. Attorney's Office for the District of Maryland documented the following wire transfers from the Plaintiffs to the Defendants in its Criminal Complaint against Mikerin:

a.      On November 27, 2009, $35,000 to Wiser.

b.      On May 6, 2010, $50,000 to Wiser.

c.      On May 17, 2010, $50,000 to Wiser.

d.      On January 18, 2011, $50,000 to Wiser.

e.      On February 28, 2011, $50,000 to Wiser.

f.      On April 25, 2011, $50,000 to Wiser.

g.      On September 2, 2011, $50,000 to Leila.

h.      On October 25, 2011, $25,000 to Leila.

75.     The above $360,000 is not an exhaustive list of all of the wire transfers the Plaintiffs made to the Defendants' via Wiser, Leila, or IFC.

76.     Similarly, the Plaintiffs received e-mail instructions from Mikerin, using the alias "F," to provide the extorted payments as cash whenever Tenex officials were in the U.S.  For example, on January 1, 2012, Mikerin e-mailed Campbell that "some visitors are going to be in our country during the third decade [*sic*] of January[.]"  The e-mail continued by asking Campbell to confirm whether he could provide his kickback sum in cash, "arrange[d] physically in the envelopes considering that this

time we would prefer as much as possible in the range 50-100% [of the $50,000] to optimize our System's streams."  This e-mail is attached as **Exhibit F**.

      77.    The U.S. Attorney's Office for the District of Maryland documented the following cash transfers from Campbell to the Defendants in its Criminal Complaint against Mikerin:

      a.    On January 25, 2011 in the amount of $25,000.

      b.    On October 28, 2011 in the amount of $25,000.

      c.    On January 23, 2012 in the amount of $50,000.

      78.    The above $100,000 is not an exhaustive list of all of cash transfers Campbell made to the Defendants' via Wiser, Leila, or IFC.

      79.    Subsequently, if a payment was not timely received, Campbell received follow-up e-mails from Mikerin, using the alias "F."  For example, on May 3, 2011, Mikerin wrote Campbell that "[y]our funds have not been received and even are not visible."  After admonishing Campbell for the missed transfer, Mikerin threatened, "It's is [*sic*] fully your responsibility to implement your obligations in front of your Partner but your transactions already created a lot of technical and administrative problems for our System: we will urge your partner to reconsider the situation in general and in particular."

      80.    The TLI Defendants similarly utilized the wire to participate in the ongoing kickback and extortion scheme.  For example:

      a.    Fisk, on behalf of the Defendants, e-mailed Campbell with wiring information for the regular $50,000 payments.  For example, on July 13, 2011, he e-mailed Campbell with wiring instructions for a bank in Latvia to which the Plaintiffs were to transfer funds.  This e-mail is attached as **Exhibit G**.

17

b.      The TLI Defendants would also e-mail invoices from consultants TLI had hired for Sigma and Campbell to pay.  For example, on November 4, 2010, Fisk e-mailed Campbell, noting that TLI's consultant Cheryl Moss wanted payment by check.  This e-mail is attached as **Exhibit H**.  The Plaintiffs subsequently mailed the check to Ms. Moss.

81.     Finally, the Plaintiffs received an e-mail from Tenex official Buzina on June 7, 2012 forwarding a termination letter, signed by Grigoriev, ending their contract with Tenex that same day.  The transmittal e-mail also stated that the original letter would be sent via the United Parcel Service.  The transmittal e-mail and termination letter are attached as **Exhibit I**.

82.     The Plaintiffs also received a second termination letter, signed by Polgorodnik, sent first by wire and then by mail.  The second termination letter is attached as **Exhibit J**.  In that letter, Polgorodnik thanked the Plaintiffs for their consulting services, noting,

> We have appreciated the stable support of SIGMA and you personally since 2007 and during the very volatile situation when TENEX had been restarting its commercial operations after a long brake.  [*sic*]  Following the conclusion of the first commercial contracts with the U.S. utilities in 2009 with your continuous assistance we managed to accomplish multiple ambitious tasks and, to be the most noted, ensured the smooth approval process of all the new contracts through the U.S. Department of Commerce, which is a valid sign that the considerable progress in overcoming the anti-Russian bias in the U.S. has been made.

Exhibit D, p. 1.

### *The Federal Criminal Charges*

83.     Campbell's participation in the FBI's investigation paid off in 2014, when the FBI arrested Mikerin and Condrey, among others, on criminal charges for being part of an illegal kickback and extortion scheme involving Tenex and its vendors.

84.     On July 25, 2014, the U.S. Attorney's Office for the District of Maryland filed a Criminal Complaint and Warrant against Mikerin.  A redacted copy of the Criminal Complaint is attached as

**Exhibit K**.  In it, Mikerin is charged with conspiring to violate the Hobbs Act, 18 U.S.C.A. § 1951, a RICO predicate act.  Campbell is identified as Confidential Source-1 in the supporting affidavit and as Victim 1 in the Criminal Complaint itself.  *See* Exhibit E, pp. 1, 5-8.

85.     The federal grand jury in the District of Maryland returned an Indictment against Mikerin on November 12, 2014 for, *inter alia*, "conspiracy to interfere with interstate commerce by extortion." A copy of the Indictment is attached as **Exhibit L**.  Campbell is referred to as "Victim One" in this Indictment.  Exhibit F, p. 3.

86.     Mikerin pled guilty pursuant to a Superseding Information regarding conspiracy to commit money laundering.  He was sentenced to 48 months imprisonment on November 6, 2014.

87.     The U.S. Attorney's Office for the District of Maryland filed a Criminal Complaint and Warrant against Condrey on October 29, 2014.  On June 17, 2015, the U.S. Attorney's Office filed a signed Plea Agreement with the court.  A copy of the Plea Agreement is attached as **Exhibit M**. Condrey pled guilty on that same date to a Criminal Information for conspiracy to violate the Foreign Corrupt Practices Act and to commit wire fraud. Upon information and belief, Condrey is still awaiting sentencing.

88.     The actions and activities contained in these criminal filings mirror the Plaintiffs' allegations.  The Plaintiffs were the victim of an admitted and extensive kickback and extortion ring operated by the Defendants.

**COUNT ONE**
**Pursuant to 18 U.S.C.A. § 1962(c)**
**Against Mikerin**

89.     The Plaintiffs incorporate by reference the prior allegations as though stated in full herein.

90.     RICO provides, "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity …."  18 U.S.C.A. § 1962(c).

91.     Tenex, until October 2010, and Tenam, from October 2010 and onward, constitute an Enterprise within the meaning of 18 U.S.C.A. § 1961(4).  At all relevant times, they sold and transported Russian LEU fuel to U.S. utilities and were thus engaged in and affected interstate and international commerce.

92.     The Enterprise is an ongoing organization that is separate and distinct from each of the Defendants.

93.     Mikerin conducted the affairs of the Enterprise through a pattern of racketeering activity within the meaning of RICO, 18 U.S.C.A. §§ 1961(1) and (5).

94.     As the Director of the Pan American Department for Tenex until October 2010 and as the Executive Director of Tenam starting in October 2010 onward, Mikerin operated and managed the affairs of the Enterprise.

95.     A prohibited "racketeering activity" is defined as "(A) any act or threat involving … extortion …which is chargeable under State law and punishable by imprisonment for more than one year, [or] (B) any act which is indictable under … title 18, United States Code … section 1341 (relating to mail fraud), section 1343 (relating to wire fraud) … [or] section 1951 (relating to interference with commerce, robbery, or extortion) …."  18 U.S.C.A. § 1961(1).

96.     The pattern of racketeering activity consists of multiple acts of extortion by which Mikerin threatened Campbell with physical harm and the Plaintiffs with economic injury unless they

consented to remit monies paid to them.  Extortion is prohibited by Maryland law and punishable by over one year in jail.  *See* Maryland Criminal Code, §§ 3-701 (extortion generally), 3-705 (extortion by verbal threat), and 3-706 (extortion by written threat).

97.    The pattern of racketeering activity also consists of multiple acts indictable under 18 U.S.C.A. § 1341 (relating to mail fraud) and § 1343 (relating to wire fraud).  As noted earlier, Mikerin utilized the mail and wires in order to transmit instructions and threats to Campbell.

98.    Moreover, Mikerin's extortion scheme violated the Hobbs Act (18 U.S.C.A. § 1951(a)) as he extorted monies from the Plaintiffs who were engaged in the sale of Russian nuclear fuel to U.S. utility companies.  Therefore, Mikerin's scheme affected interstate and foreign commerce.

99.    These acts were carried out repeatedly and continuously from at least July 2009 through June 7, 2012, or later, as described in detail above.  The predicate acts relate to each other in that they were performed as part of a common plan, scheme, and conspiracy to increase the amount of kickbacks that Mikerin and others could receive, both from Tenex's ever-growing coffers, thanks to Campbell's contribution to over $6 billion in contracts for Tenex, as well as from Campbell's consulting income itself.

100.    The pattern and the Enterprise are separate.  The Enterprise engages in the legitimate function of selling and transporting Russian LEU fuel to U.S. utilities.  The pattern of racketeering involves the separate activity of repeatedly and habitually utilizing mail and wire fraud and extortion tactics to collect kickbacks and extorted funds.

101.    Mikerin knowing and intentionally participated in the kickback and extortion scheme.

102.    As set forth above, Mikerin, on numerous occasions, used and caused to be used the mail to transmit documents in furtherance of and for the purpose of executing the scheme and artifice to defraud.

103.    As set forth above, Mikerin, on numerous occasions, utilized and caused to be used e-mail to transmit documents in furtherance of and for the purpose of executing the scheme and artifice to defraud.

104.    Mikerin intentionally and knowingly engaged in a scheme to defraud the Plaintiffs and intended for the Plaintiffs to rely upon his representations as to the legitimate nature of the Enterprise in order for the Plaintiffs to provide legitimate lobbying and consulting services before U.S. government and private officials on behalf of Tenex despite not receiving full compensation for their services.

105.    Mikerin also intentionally and knowingly engaged in a scheme of extortion involving threats of physical injury against Campbell and of the Plaintiffs' economic loss.

106.    Mikerin profited from the kickback and extortion scheme and knew he was receiving funds from the Plaintiffs that were the proceeds of this fraudulent scheme.

107.    Campbell and Sigma have suffered direct harm by reason of Mikerin's violation of RICO.  Among other things, the Plaintiffs lost the benefit of at least $460,000, but likely as much as $760,000, in compensation for services they provided.  The Plaintiffs have also suffered direct harm as evidenced by the subsequent severe and unwarranted harm to their professional reputation after their contract was terminated and the FBI's investigation became public.

108.    Such results are a direct, proximate, and foreseeable consequence of Mikerin's extortion scheme.

109.    The foregoing misconduct constitutes a continuing series of unlawful acts, each of which caused discrete injuries – namely, the payment of extorted funds, threats of physical violence and economic injury, and other distinct losses.

WHEREFORE, the Plaintiffs respectfully request a judgment in their favor and against Mikerin for violations of RICO that awards treble the amount of damages that the Plaintiffs have sustained as well as attorneys' fees and costs as permitted by RICO and such other and further relief as this Court may deem just and equitable under the circumstances.

**COUNT TWO**
**Pursuant to 18 U.S.C.A. § 1962(d)**
**Against all Defendants**

110.    The Plaintiffs incorporate by reference the prior allegations as though stated in full herein.

111.    RICO provides, "It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."  18 U.S.C.A. § 1962(d).

112.    The Defendants have conspired to violate 18 U.S.C.A. § 1962(c).  The object of these ongoing conspiracies was to conduct or participate in, directly or indirectly, the Enterprise's affairs through a pattern of racketeering activity so as to advance their kickback and extortion scheme.

113.    Each of the Defendants adopted the goal of furthering or facilitating the kickback and extortion scheme minimally by directly engaging in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy.  These actions included issuing multiple threats of extortion by which the Defendants threatened Campbell with physical harm and the Plaintiffs with economic injury; transmitting instructions for remitting the extorted kickbacks and threats to the Plaintiffs by mail and wire; and engaging in violations of the Hobbs Act (18 U.S.C.A. § 1951(a)) by

extorting monies from the Plaintiffs, who were involved in the sale of Russian nuclear fuel to U.S. utility companies, and thereby affecting interstate and foreign commerce.

114.    In addition, the Defendants facilitated the kickback and extortion scheme by knowingly accepting and distributing or using the proceeds of the kickback and extortion scheme.

115.    The conspiracy was carried out repeatedly and continuously from at least July 2009 through June 7, 2012, or later, as described in detail above.  The predicate acts relate to each other in that they were performed as part of a common plan, scheme, and conspiracy to increase the amount of kickbacks that the Defendants could receive, both from Tenex's ever-growing coffers, thanks to Campbell's contribution to over $6 billion in contracts for Tenex, as well as from the Plaintiffs' consulting income.

116.    The Defendants knowingly conspired to participate in the kickback and extortion scheme, including by using or causing to be used the mail or e-mail in furtherance of and for the purpose of executing the scheme and artifice to defraud.

117.    The Defendants further knowingly conspired to engage in a scheme to defraud the Plaintiffs and intended for the Plaintiffs to rely upon their representations as to the legitimate nature of the Enterprise in order for the Plaintiffs to provide legitimate lobbying services before U.S. government and private officials on behalf of Tenex despite not receiving full compensation for their services.

118.    The Defendants also knowingly conspired to engage in a scheme of extortion involving threats of physical injury against Campbell and of the Plaintiffs' economic loss.

119.    The Defendants profited from the kickback and extortion scheme and knew they were receiving funds from the Plaintiffs that were the proceeds of this fraudulent scheme.

120.    Campbell and Sigma have suffered direct harm by reason of Defendants' violation of RICO.  Among other things, the Plaintiffs lost the benefit of at least $460,000, but likely as much as $760,000, in compensation for services they provided.  The Plaintiffs have also suffered direct harm as evidenced by the subsequent severe and unwarranted harm to their professional reputation after their contract was terminated and the FBI's investigation became public.

121.    Such results are a direct, proximate, and foreseeable consequence of the Defendants conspiracy to issue multiple threats of extortion by which the Defendants threatened Campbell with physical harm and the Plaintiffs with economic injury; transmit instructions for remitting the extorted kickbacks and threats to the Plaintiffs by mail and wire; and engage in violations of the Hobbs Act (18 U.S.C.A. § 1951(a)) by extorting monies from the Plaintiffs, who were involved the sale of Russian nuclear fuel to U.S. utility companies, and thereby affect interstate and foreign commerce.

122.    Under the provision of 18 U.S.C.A. § 1964(d), each of the Defendants is jointly and severally liable to the Plaintiffs for three times the damages sustained plus the cost of bringing suit and reasonable attorney's fees.

123.    The foregoing misconduct constitutes a continuing series of unlawful acts, each of which caused discrete injuries – namely, the payment of extorted funds, threats of physical violence and economic injury, and other distinct losses.

WHEREFORE, the Plaintiffs respectfully request a judgment in their favor and against the Defendants for violations of RICO that awards treble the amount of damages that the Plaintiffs have sustained as well as attorneys' fees and costs as permitted by RICO and such other and further relief as this Court may deem just and equitable under the circumstances.

**COUNT THREE**
**Civil Conspiracy**
**Against all Defendants**

124.    The Plaintiffs incorporate by reference the prior allegations as though stated in full herein.

125.    The Defendants conspired, colluded, schemed, and agreed to extort monies from the Plaintiffs.

126.    The Defendants recruited the Plaintiffs to become a consultant to Tenex for the sole purpose of then extorting illegal kickbacks from the Plaintiffs of the monies paid to them by Tenex for their legitimate consulting services.

127.    The Defendants then threatened Campbell with physical harm and the Plaintiffs with economic injury if they did not cooperate with the Defendants' kickback and extortion scheme.

128.    The Defendants intentionally and wrongfully extorted from the Plaintiffs the amount of at least $460,000, but likely as much as $760,000, of the consulting fees paid to the Plaintiffs by Tenex without authority or permission.

129.    The Plaintiffs had a right to possess all monies paid to them by Tenex pursuant to their consulting contracts, including monies wrongfully and intentionally extorted by the Defendants.

130.    The Defendants acted with actual malice and/or reckless disregard to the Plaintiffs' right to possess all monies paid to them by Tenex pursuant to their consulting contracts and consequently owe the Plaintiffs punitive damages.

131.    The foregoing misconduct constitutes a continuing series of unlawful acts, each of which caused discrete injuries – namely, the payment of extorted funds, threats of physical violence and economic injury, and other distinct losses.

132.    Each of the Defendants is jointly and severally liable to the Plaintiffs for damages sustained as a result of the Defendants' actions and violations.

WHEREFORE, the Plaintiffs respectfully request a judgment in their favor and against the Defendants, jointly and severally, for civil conspiracy and an award of damages, punitive damages, together with attorney's fees and costs and such other relief as the Court may deem equitable and just.

### COUNT FOUR
### Conversion
### Against all Defendants

133.    The Plaintiffs incorporate by reference the prior allegations as though stated in full herein.

134.    The Plaintiffs provided actual and beneficial consulting services to Tenex pursuant to their consulting contracts with Tenex.  For these services, the Plaintiffs were paid $1,199,975 in consulting fees by Tenex.

135.    Tenex, in their June 7, 2012 termination letter of the Plaintiffs' consulting contract, acknowledged the "stable support of SIGMA and [Campbell] personally since 2007" and their accomplishment of the first commercial contracts with U.S. utilities in 2009 "with [the Plaintiffs'] continuous assistance."  Tenex credited the Plaintiffs' work with accomplishing "multiple ambitious tasks," including "the smooth approval process of all the new contracts through the U.S. Department of Commerce."  Tenex further recognized the Plaintiffs for making "considerable progress in overcoming the anti-Russian bias in the U.S."

136.    For this work, the Plaintiffs have a right to possess all monies paid to them by Tenex pursuant to their consulting contracts, including monies wrongfully and intentionally extorted by the Defendants.

137.     The Defendants intentionally and wrongfully extorted from the Plaintiffs the amount of at least $460,000, but likely as much as $760,000, of the consulting fees paid to the Plaintiffs by Tenex without authority or permission.

138.     The Defendants acted with actual malice and/or reckless disregard to the Plaintiffs' right to possess all monies paid to them by Tenex pursuant to their consulting contracts and consequently owe the Plaintiffs punitive damages.

139.     Mikerin and others threatened the Plaintiffs that they would suffer harm if they did not cooperate with the extortion scheme and remit these payments to the Defendants.

140.     The Defendants and others repeatedly reminded the Plaintiffs that they were part of a larger network operating in the U.S., Europe, and Middle East that included dangerous individuals who could harm Campbell.

141.     The Plaintiffs did not willingly remit these funds to the Defendants but did so only because of the Defendants' acts of extortion described here and elsewhere in this Complaint.

142.     The foregoing misconduct constitutes a continuing series of unlawful acts, each of which caused discrete injuries – namely, the payment of extorted funds, threats of physical violence and economic injury, and other distinct losses.

143.     Each of the Defendants is jointly and severally liable to the Plaintiffs for damages sustained as a result of the Defendants' actions and violations.

WHEREFORE, the Plaintiffs respectfully request a judgment in their favor and against the Defendants, jointly and severally, for conversion and an award of damages, punitive damages, together with attorney's fees and costs and such other relief as the Court may deem equitable and just.

## COUNT FIVE
### Negligent Misrepresentation
### Against all Defendants

144.   The Plaintiffs incorporate by reference the prior allegations as though stated in full herein.

145.   At all relevant times, the Defendants owed a duty to deal honestly and fairly with the Plaintiffs with whom they engaged in business.

146.   Starting in or about 2005 when they first met, Defendants secretly selected and groomed Campbell for their kickback and extortion scheme without the Plaintiffs' knowledge or consent.

147.   The Defendants made a series of negligent misrepresentations of fact to the Plaintiffs, such as that the Plaintiffs could have legitimate consulting contracts with Tenex and that such contracts would provide $50,000 a month as income to be earned and retained by the Plaintiffs.

148.   The Defendants also negligently misrepresented that the Plaintiffs needed to learn the processes and systems associated with nuclear fuel sales in order to qualify for such consulting contracts with Tenex.

149.   The Defendants, Mikerin in particular, should have or did know that the foregoing representations were false.  In truth, the Defendants only sought to provide the Plaintiffs with consulting contracts for Tenex as a means to further expand their own secret and illegal kickback and extortion scheme and to enrich themselves and others by extorting from the Plaintiffs at least half, if not more, of the fees and payments paid by Tenex to the Plaintiffs pursuant to the consulting contracts.

150.   The Defendants intended and had knowledge that their representations to the Plaintiffs would probably be acted upon by the Plaintiffs such that the Plaintiffs would want to enter into, and indeed would in fact enter into, consulting contracts with Tenex.

151.    The Plaintiffs reasonably relied, and were justified in relying, upon the Defendants' misrepresentations because the Defendants had the relationships with, and influence and control at, Tenex, as well as experience in the processes and systems associated with nuclear fuel sales and transportation in the U.S.

152.    The Defendants' misrepresentations have resulted in damages to the Plaintiffs proximately caused by the Defendants' negligence in the amount of at least $460,000, but likely as much as $760,000, in diverted income.

153.    The foregoing misconduct constitutes a continuing series of unlawful acts, each of which caused discrete injuries – namely, the payment of extorted funds, threats of physical violence and economic injury, and other distinct losses.

154.    Each of the Defendants is jointly and severally liable to the Plaintiffs for damages sustained as a result of the Defendants' actions and violations.

WHEREFORE, the Plaintiffs respectfully request a judgment in their favor and against the Defendants jointly and severally, for negligent misrepresentation and an award of damages together with attorney's fees and costs and such other relief as the Court may deem equitable and just.

### JURY DEMAND

Plaintiffs hereby demand trial by jury on all issues so triable.

Respectfully Submitted,

Dated:  June 6, 2016

*/s/ Elizabeth J. Goldstein*
Elizabeth J. Goldstein, Esq.
Maryland Atty. Id. No. 1101050004
egoldstein@dilworthlaw.com
Dilworth Paxson LLP
Penn National Insurance Building
2 North 2nd Street, Suite 1101
Harrisburg, Pennsylvania 17101
T:  (717) 213-4106
F:  (717) 236-7811
*Attorneys for Plaintiffs*